UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**Case Number: 19-20735-CIV-MORENO**

JONES SUPERYACHT MIAMI, INC.,

        Plaintiff,

vs.

M/Y WAKU, her engines, tackle and other appurtenances in Rem, an aluminum hull of 36.77 meters, Cayman Island Official Number 741370,

        Defendant,

FRS AFFAIR LIMITED,

        Claimant.

_____/

## FINAL ORDER AFTER TRIAL

Plaintiff Jones Superyacht Miami, Inc. filed an *in rem* action against the Waku Trinity yacht to establish a maritime lien on vessel pursuant to 46 U.S.C. § 31342. The yacht had been subjected to action by the Office of Foreign Assets Control ("OFAC") but was eventually sold through a U.S. Marshal sale at an auction. The reason for the OFAC action was the alleged suspect illegal activity by the original owner, Samark Jose Lopez Bello of EPBC Holdings Limited. OFAC's reason for its action is irrelevant in deciding this case, except for the Court to decide if it has admiralty and maritime jurisdiction. If the yacht is a vessel used as a means of marine transportation for people or things, then the Court has subject matter jurisdiction. If it is not, then the Court has no power to order the new owner of the yacht to pay the Plaintiff for the dockage and other costs of its holding of the yacht.

The claimant FRS Affair Limited eventually became the owner of the Waku Trinity and argues that the Waku Trinity yacht was not technically a vessel under federal maritime law due to the OFAC action preventing its use as a means of marine transportation for people or things. FRS also contends that a maritime lien cannot attach to a "dead ship." In addition, FRS argues that even if the Court has jurisdiction, the expenses claimed by Jose Bared on behalf of Jones Superyacht Miami were not necessary, substantially overpriced, and not done under the direction of the vessel's agent.

The Court preliminarily has denied the motion to dismiss to proceed to trial in order to resolve the factual disputes revolving around the status of the Waku Trinity yacht. If the Court does indeed have admiralty jurisdiction, then it must continue to make separate findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52 and determine whether Jones Superyacht Miami through its President Jose Bared can foreclose its maritime lien against the eventual vessel owner FRS. The Court concludes that it does have jurisdiction and that Jones Superyacht is entitled to $429,300.

## LEGAL ANALYSIS

To establish its maritime lien on a vessel pursuant to 46 U.S.C. § 31342 in an *in rem* action, the plaintiff must prove that (1) it provided necessaries (2) at a reasonable price (3) to the vessel (4) at the direction of the vessel's owner or agent. *See Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1249 (11th Cir. 2005).

### I. WHETHER THE WAKU TRINITY YACHT WAS A VESSEL.

1 U.S.C. § 3 provides as follows: "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." The Supreme Court in *Lozman v. City of Riviera Beach, Fla.*, 568 U.S.

115, 133 S.Ct. 735, 739 (2013) held that the "petitioner's floating home (which [was] not self-propelled)" was not a vessel, "believ[ing] that a reasonable observer, looking to the home's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water." In that case, when determining whether the floating home fell "within the terms of [a vessel's] definition" under § 3, the Court "focus[ed] primarily upon the phrase 'capable of being used,'" noting how "[t]his term encompasses 'practical' possibilities, not 'merely . . . theoretical' ones." *Id.* (citing *Stewart v. Dutra Constr. Co.*, 543 U.S. 481, 496, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005)). Stated differently, a vessel includes an "artificial contrivance . . . capable of being used . . . *as a means of transportation on water*," *see id.* at 741 (emphasis in original) (citing 1 U.S.C. § 3), and such "'transportation' involves the 'conveyance (of things or persons) from one place to another[,]'" *id.* (citing 18 Oxford English Dictionary 424 (2d ed. 1989) (OED)). Applying this definition in a practical way, the Court reasoned that the floating home was not a vessel because, "[b]ut for the fact that it float[ed], nothing about [petitioner's] home suggest[ed] that it was designed to any practical degree to transport persons or things over water[]": "[1] [i]t had no rudder or other steering mechanism"; "[2] [i]ts hull was unraked, [] and it had a rectangular bottom 10 inches below the water"; "[3] [i]t had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land"; "[4] [i]ts small rooms looked like ordinary nonmaritime living quarters"; "[5] [a]nd those inside those rooms looked out upon the world, not through watertight portholes, but through French doors or ordinary windows." *Id.* (internal citations omitted). And while not dispositive, "lack of self-propulsion . . . may be a relevant characteristic," and, in *Lozman*, the Court considered that the "home was able to travel over water only by being towed." *Id.* (internal citations omitted).

3

Applying § 3 and *Lozman*, the Court must determine whether a reasonable observer, looking to the Waku Trinity's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water. *Lozman*, 133 S.Ct. at 739. After considering the Waku Trinity's physical characteristics, hearing the testimony of witnesses, and reviewing the photographs of the vessel, the Court cannot say a reasonable observer "would not consider it to be designed to any practical degree for carrying people or things on water."





In terms of physical characteristics, the Waku Trinity is a far cry from the floating home with French doors and ordinary windows that lacked a rudder or other steering mechanism in *Lozman*, which was not a vessel. *Lozman*, 133 S.Ct. at 739. While the Waku Trinity was docked at Jones Superyacht's shipyard, pursuant to the Dockage Agreement, Jones Superyacht paid Captain Joe Williams and Eric Castillo for maintenance work completed on the vessel. Such maintenance only ceased in February 2019 when a Writ of Execution was entered, and the U.S. Marshal did not

allow anyone on the Waku Trinity. As to its activities, the Waku Trinity self-propelled itself from Bahia Mar Marina in Fort Lauderdale to Jones Superyacht in Miami, with only tugboat assistance from the mouth of the Miami River to where it was berthed at Jones Superyacht's facility. The Waku Trinity's inactive state while it was at Jones Superyacht's boatyard did not divest it of its vessel status. For the exception of a sea trial, the Office of Foreign Assets Control action in place while the Waku Trinity was at Jones Superyacht prevented its use in marine navigation in a technical sense. But in a practical sense, the Waku Trinity remained a vessel, because, despite its temporary dormant state at Jones Superyacht, no reasonable observer "would not consider it to be designed to any practical degree for carrying people or things on water." *Lozman*, 133 S.Ct. at 739.

The Court finds that vessel owner FRS' arguments, although creative and well-presented by defense counsel, are not sufficiently convincing. FRS contends that the Waku Trinity was not a vessel because the Office of Foreign Assets Control issued an Amended License concerning the Waku Trinity pursuant to the Foreign Narcotics Kingpin Sanctions Regulations, 31 C.F.R. 598, that prevented its use as a means of marine transportation for people or things.

The import of an order blocking a vessel from navigation by the Office of Foreign Assets Control and Foreign Narcotics Kingpin Sanctions Regulations is an interesting issue, but the Court finds that after *Lozman*, the test is whether an object is a vessel: whether "a reasonable observer, looking to the [alleged vessel's] physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water." *Lozman*, 133 S.Ct. at 739.

This lower court does not reach the issue of whether Eleventh Circuit's decision in *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864 (11th Cir. 2010) is no longer good law after *Lozman*. *Crimson Yachts* predated *Lozman* (2013), which abrogated *Board of Com'rs of Orleans v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008), and the Eleventh Circuit may have relied

on that abrogated decision in *Crimson Yachts*. In *Crimson Yachts*, the shipyard sought "to enforce a maritime lien for major repairs it performed on a motor yacht" and the district court dismissed the shipyard's *in rem* claims against the yacht because it was not a vessel subject to a maritime lien. 603 F.3d at 867. On appeal, the Eleventh Circuit reversed the district court's order of dismissal and remanded for further proceedings, holding that its "long line of precedent demonstrate[d] that despite her massive overhaul, the [yacht] maintained her vessel status during the repair period" and "[n]either the manner of her repair, nor the fact that the needed repairs were so extensive as to temporarily disable her, divested her of her status as a vessel." *Id.* at 875. Moreover, the fact that the yacht was "drydocked for the repairs [did not] divest her of vessel status." *Id.* And neither did the fact that after the parties reached their agreement regarding the repairs, the yacht's "engines, propellers, propeller shafts, generators, and most of its furniture and equipment were removed, [] it was towed to [the] shipyard[,]" and "[t]he work and the corresponding payments continued for a year and a half." *Id.* at 867.

While the *Lozman* test resolves the vessel inquiry here, the Court finds that "despite her massive overhaul [after FRS purchased the Waku Trinity], the [Waku Trinity] maintained her vessel status during [time she was at Jones Superyacht's boatyard] in light of the Eleventh Circuit's decision in *Crimson Yachts*. 603 F.3d at 875.

To the extent that FRS points to statements made about the Waku Trinity where Mr. Jose Bared, President of Jones, referred to it as "abandoned" or "derelict," or Mr. Frank Sarria, an FRS member, described it as "mothballed, just sitting there," these statements are not helpful. As the Supreme Court noted in *Lozman*: "[W]e have sought to avoid subjective elements, such as owner's intent, by permitting consideration only of objective evidence of a waterborne transportation purpose. That is why we have referred to the views of a reasonable observer. And that is why we

6

have looked to the physical attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner." *Lozman*, 133 S.Ct. at 744-45 (internal citations omitted).

Thus, applying *Lozman's* reasonable observer test here, the Court concludes the Waku Trinity is a vessel because, after considering its physical characteristics and activities, no reasonable observer "would not consider it to be designed to any practical degree for carrying people or things on water." *Lozman*, 133 S.Ct. at 739.

## II. WHETHER THE WAKU TRINITY WAS A "DEAD SHIP."

Next, FRS contends that the Waku Trinity cannot be a vessel because it is a dead ship, and a maritime lien cannot attach to a dead ship. *See Amoco Oil v. M/V Montclair*, 766 F.2d 473, 477 (11th Cir. 1985) ("A 'vessel' is subject to a maritime lien. A 'dead ship' is not."). In *Amoco Oil*, the Eleventh acknowledged that "[t]here is no statutory definition of a dead ship" and, in that case, stated that "[they] [were] not attempting to set out a definition of a dead ship which would fit every occasion." *Id.* Rather, the Eleventh Circuit "simply h[e]ld that the Barge [] was a vessel and subject to a maritime lien under the facts in th[at] case." *Id.* at 477-78.

In *Amoco Oil*, the barge was being towed at the time of the accident because it "had no propulsion and was manned by a 'riding crew' who were not involved in the navigation." *Id.* at 474. The barge collided with another barge and dock facility, and the owners of the damaged barge and dock facility sued the offending barge *in rem* and *in personam*. *Id.* at 475. The Eleventh Circuit affirmed the district court's denial of the offending barge's motion for summary judgment and entry of final judgment against it as it related to its *in rem* liability. *Id.* The Eleventh Circuit held that the offending barge was a vessel and not a dead ship "in view of the following authorities":

> First, the Third Circuit drew a distinction between a "dead ship" and a "vessel" stating that where a ship was not properly documented and was not able to sail, but

7

> efforts of everyone concerned were bent on readying her for a sealing voyage, the ship was not a "dead ship," that is, a ship withdrawn from navigation and marine commerce, but was a "vessel" subject to admiralty jurisdiction in libel *in rem* to assert a maritime lien for repairs. *Hercules Co. Inc. v. The Brigadier General Absolom Baird*, 214 F.2d 66, 69 (3rd Cir. 1954). In addition, the Eastern District of Virginia has held that where practically all of the work in deactivating a vessel for the purpose of its return to a moth ball fleet had been completed at the time of an injury on the vessel to a marine surveyor hired to conduct an off-hire condition survey preparatory to final termination of the charter, the vessel was a "dead ship" and was "out of navigation" at the time and place of the accident and the surveyor was not entitled to recover under the doctrine of unseaworthiness. *Noel v. Isbrandtsen Co.*, 179 F.Supp. 325, 328 (E.D. Va. 1959). Finally, the Eastern District of New York has defined a "dead ship" saying that a vessel which had been completely withdrawn from commerce and navigation and was in such condition that extensive repairs and proper documentation would have been required to return it to navigation and commerce was a "dead ship" not subject to a maritime lien. *Hanna v. The Meteor*, 92 F.Supp. 530, 531 (E.D.N.Y. 1950).

*Amoco Oil*, 766 F.2d at 477. The Eleventh Circuit reasoned that "[a] reading of the cases distinguishes a dead ship from a vessel by determining whether or not the object in question had or had not been withdrawn from navigation and maritime commerce." *Id.*

FRS also directs the Court to *Roper v. United States*, 368 U.S. 20, 21, S.Ct. 5, 6 (1961) for the proposition that the ship there was a "dead ship" because it had been "deactivated from service and 'mothballed.'" In *Roper*, a longshoreman filed an *in personam* suit against the United States arising out of injuries suffered while aboard a U.S. ship "removing grain to an elevator." *Id.* at 6. There, "[t]he S.S. Harry Lane was a liberty ship of World War II origin, which deactivated from service and 'mothballed' in 1945." *Id.* The Supreme Court expounded on that process, noting as follows: "In this process her supplies, stores, nautical instruments, cargo gear and tackle were removed; her pipes and machinery were drained and prepared for storage; and her rudder, tail shaft and propeller were secured." *Id.* The *Roper* Court also noted that, "[a]s a result of such action the ship lost her Coast Guard safety certification as well as her license to operate, both of which were requisite to a vessel in navigation," and how "the trial court found that 'admittedly' reactivation of

8

the ship would have required a major overhaul." *Id.* The ship was subsequently used to store the government's surplus grain but was not "reactivated for navigation nor used for transportation purposes," *see id.*, and the ship only served as a "mobile warehouse which was filled and then moved out of the way to perform its function of storing grain until needed, at which time it was returned and unloaded," *id.* at 7. The Supreme Court held that the ship had not been "converted into a vessel in navigation." *Roper*, 82 S.Ct. at 7.

*Amoco Oil* and *Roper* do not resolve the inquiry. *Roper* is factually distinguishable given that the "dead ship" there, unlike the Waku Trinity, had "her supplies, stores, nautical instruments, cargo gear and tackle [] removed; her pipes and machinery [] drained and prepared for storage; and her rudder, tail shaft and propeller [] secured," 82 S.Ct. at 6, and it did not regain "in navigation" status when it was used by the government to store grain, *id.* at 7. In *Amoco Oil*, the Eleventh Circuit did not define a "dead ship" or when a ship is "withdrawn from navigation and maritime commerce." *Amoco Oil*, 766 F.2d at 477. Instead, in narrowly holding that the barge in that case was a vessel, it looked to authorities that guided its decision: *Hercules Co. Inc.*, 214 F.2d at 69 (holding that ship was not a "dead ship" where it was not properly documented and was not able to sail where efforts of everyone concerned were bent on reading the ship for a voyage); *Noel*, 179 F.Supp. at 328 (finding that vessel was a "dead ship" where practically all of the work in deactivating a vessel for the purpose of its return to a moth ball fleet had been completed at the time of an injury on the vessel); *Hanna*, 92 F.Supp. at 531 (defining a "dead ship" as a vessel which had been completely withdrawn from commerce and navigation and was in such condition that extensive repairs and proper documentation would have been required to return it to navigation and commerce).

9

The Eleventh Circuit defined "dead ships" in *Crimson Yacht* as "[s]hips rendered permanently incapable of marine transportation." 603 F.3d at 873 n.4 (citing *Amoco Oil*, 766 F.2d at 477). FRS contends that *Crimson Yachts* is not good law, this time because *Amoco Oil's* "endorsed" definition of a "dead ship" should control. (D.E. 61, at 15) (citing *Walker v. Mortham*, 158 F.3d 1177, 1188 (11th Cir. 1998) ("[W]hen circuit authority is in conflict, a panel should look to the line of authority containing the earliest case, because a decision of a prior panel cannot be overturned by a later panel.")). The Eleventh Circuit in *Crimson Yachts* cited to an Eastern District of Virginia case that also cited the Third Circuit's decision in *Hercules* for the proposition that dead ships are ships rendered permanently incapable of marine transportation, *see id.*,[1] which was one of the authorities that guided the Eleventh Circuit's decision *Amoco Oil*, *see* 766 F.2d at 477.[2] The Eleventh Circuit in *Amoco Oil* stated it was "not attempting to set out a definition of a dead ship which would fit every occasion." *Amoco Oil*, 766 F.2d at 477. The Court reads *Crimson Yachts* as supplementing *Amoco Oil*, and clarifying what has since been the test for "dead ships"

---

[1] Footnote 4 in *Crimson Yachts* reads as follows: "Ships rendered permanently incapable of maritime transportation are 'dead ships' ineligible for maritime liens. *See Amoco Oil v. M/V Montclair*, 766 F.2d 473, 477 (11th Cir. 1985) ("A 'vessel' is subject to a maritime lien. A 'dead ship' is not."); *see also Colonna's Shipyard, Inc. v. U.S.A.F. GEN. HOYT S. VANDENBERG*, 584 F.Supp.2d 862, 867 (E.D. Va. 2008) ("A key element in determining whether a watercraft that was indisputably a vessel at some point in the past is now a 'dead ship' is whether such watercraft is *permanently* withdrawn from navigation.") (citing *Hercules Co. v. The Brigadier Gen. Absolom Baird*, 214 F.2d 66, 68 (3d Cir. 1954))." *Crimson Yachts*, 603 F.3d at 873 n.4

[2] In *Hercules*, services were provided to the ship "to help prepare [the ship] for a sealing voyage," the services to the ship were completed between April 3 and July 17, 1950, and the services concluded in July 1950 "when, the working not having progressed sufficiently to enable her to depart for the 1950 sealing season, it was discontinued and she was towed to anchorage [in another destination]." 214 F.2d at 68. The ship remained there "until some time before March 19, 1951, when she was towed back to the [] [s]hipyard" where the original services were provided to receive "services preparatory to the [ship's] 1951 sealing season." The ship ended up sailing in the 1951 season. *Id.* Notwithstanding that the ship "was unable to navigate under her own power" or "was not properly documented, since she had no certificate of inspection from the Coast Guard, without which she could not have been cleared to sail, even if able," the Third Circuit held that the ship had not been "withdrawn from marine commerce and navigation." *Id.* at 69.

10

in this circuit: whether the ship is rendered "permanently incapable of marine transportation." 603 F.3d at 873 n.4 (citing *Amoco Oil*, 766 F.2d at 477).

*Crimson Yachts'* definition of a "dead ship" applies here, and, therefore, it cannot be said that the Waku Trinity was "permanently incapable of marine transportation." 603 F.3d at 873 n.4 (citing *Amoco Oil*, 766 F.2d at 477). Thus, the Court makes a finding of fact that the Waku Trinity is not a "dead ship" as defined by the Eleventh Circuit in *Crimson Yachts* and concludes that it is a vessel under *Lozman's* reasonable observer test, giving this Court subject matter jurisdiction.

## III. FINDINGS OF FACTS AND CONCLUSIONS OF LAW

Having found sufficient evidence that the Court has subject matter jurisdiction over this "living" vessel, the Court must then make findings of fact and separate conclusions of law pursuant to Fed. R. Civ. P. 52(a)(1) on the disputed issues. As the evidence has developed at trial, apart from the jurisdictional issues, there are very few truly disputed factual issues. The remaining disputes are whether Jones Superyacht (A) provided necessaries to the vessel, (B) at the direction of the vessel's owner or agent, (C) at a reasonable price. *See Sweet Pea Marine, Ltd.*, 411 F.3d at 1249.

Dockage charged for the vessel is obviously necessary. So is electrical power for the vessel. There is no longer a dispute that the vessel is 141 feet, so the factual disputes are: (1) how many days of dockage were provided at the direction of the vessel owner's agent; (2) how many days of shore power satisfy the direction element and what was a reasonable rate; (3) what monitoring services satisfy the direction element and what was a reasonable rate for such services; (4) whether the maintenance provided satisfies the direction element; (5) whether miscellaneous expenses satisfy the direction element; and (6) whether administrative fees can be awarded.

11

### 1. Dockage

On September 5, 2017, Jones Superyacht and EPBC Holdings, Ltd. entered into a Dockage Agreement that references a rate of $3.25 per foot per day for the Waku Trinity's dockage. (Tr. Ex. 1). FRS does not dispute that Jones Superyacht provided dockage to Waku Trinity, a necessary, at the direction of the vessel's agent, Castillo, and at a reasonable price, $458.25 per day (D.E. 109, at 11).[3] Yet, FRS contends that Jones Superyacht is only entitled for dockage costs through April 1, 2018—208 days of dockage—for a total of $95,316. FRS claims that it was unreasonable for Jones Superyacht to continue to complete its obligations under the Dockage Agreement considering that there had been six months' worth of invoiced services and Jones Superyacht had not received any payment for the dockage provided. Alternatively, FRS argues that Jones Superyacht cannot establish the direction element after February 25, 2019, when Castillo was barred from entering Jones Superyacht's facility in view of a writ of execution that was issued as to the Waku Trinity.

The Court finds that Jones Superyacht is entitled to the sum of $346,895.25 for dockage for the 757 days that the Waku Trinity was docked at Jones Superyacht's facility or, stated differently, from September 5, 2017 through and including October 2, 2019. It was reasonable for Jones Superyacht to continue providing dockage to the Waku Trinity pursuant to the Dockage Agreement, and the dockage was provided at the direction of the vessel owner's agent, Castillo. Even if Castillo's access to the vessel was restricted, there is no record evidence that the Dockage Agreement was cancelled by the prior vessel owner or its agent while the Waku Trinity was docked at Jones Superyacht's facility. The vessel owner directed Jones Superyacht to provide dockage to

---

[3] In fact, at trial, one of FRS' experts, Mr. Robert Toney, opined that there was "no basis to complain about [Jones Superyacht's] dockage rate." (Tr. Transcript, July 21, 2021, at 83:2-4).

12

the Waku Trinity and, even after Castillo's access was restricted after the writ of execution was issued, Castillo did not direct Jones Superyacht at any point to stop providing dockage.

Thus, the Court shall award Jones Superyacht **$346,895.25** for the Waku Trinity's dockage at Jones Superyacht from September 5, 2017 through and including October 2, 2019, as the dockage was a "necessary" that was provided to the Waku Trinity at the direction of the vessel owner's agent and the dockage rate of $458.25 per day was reasonable. *See Sweet Pea Marine, Ltd.*, 411 F.3d at 1249.

### 2. Shore Power

The parties disagree as to the reasonable price for the Waku Trinity's daily electricity consumption and the duration of time that Jones Superyacht could permissibly charge for the shore power provided to the vessel. To the extent that FRS argues that the shore power was not provided at the direction of the vessel's owner or required to be provided by the vessel's substitute custodian, the Court rejects these arguments in light of the Dockage Agreement. As to the reasonable price for the Waku Trinity's shore power while docked at Jones Superyacht, the Court finds that $10 per day for electricity is a reasonable rate after considering Mr. Bared's sworn declaration (D.E. 4-1).

On February 25, 2019, Jones Superyacht's Jose Bared signed and declared under penalty of perjury that "[Jones Superyacht] w[ould] charge for dockage on the basis of $3.25 foot/day or $458.25 per day, plus electrical power in the amount of $10.00 per day, if necessary, and all other required services or repairs." (D.E. 4-1).

The Court finds that the $10 per day for shore power, provided in Mr. Bared's sworn declaration, is a reasonable price for the shore power, a necessary that was provided to the Waku

Trinity at the direction of vessel owner's agent. The Court shall award Jones Superyacht **$7,570.00** for the Waku Trinity's shore power for the 757 days that it was docked at Jones' facility.[4]

### 3. Monitoring Services

The Court need not reach the issues implicated by the monitoring costs, e.g., whether the monitoring services were provided at the direction of the vessel owner's agent or whether such services were provided at a reasonable price. Jones Superyacht seeks an award for its "after hours monitoring," "daily monitoring during working hours," and "additional daily crew monitoring" for the 757 days that the Waku Trinity was docked at Jones Superyacht, for a total of $236,149. Again, in his sworn declaration attached to Jones Superyacht's motion to be appointed substitute custodian, Mr. Bared stated as follows:

> Jones Superyacht [] will perform the following services for the Vessel during its custodianship:
>
> a. It will provide security, fire watch, and will periodically inspect mooring lines, etc.;
>
> b. It will charge for dockage on the basis of $3.25 foot/day or $458.25 per day, plus electric power in the amount of $10.00 per day, if necessary, and all other required services or repairs, if needed, as needed and as per Jones['] [] Tariff Sheet.

(D.E. 4-1, at 2). The attached sheet is silent as to the rate for security or monitoring services. Given Mr. Bared's declaration, the Court finds that monitoring services are subsumed within the security services that Jones Superyacht provided to the Waku Trinity and the costs of these monitoring services were already factored into the dockage and electricity rate of $468.25 per day and the rate for these services is reasonable. Accordingly, the Court shall not award any additional costs

---

[4] After the close of all evidence, including Mr. Bared's testimony and closing arguments, while the case was under submission for a decision of the Court, one of the lawyers for Plaintiff alleges that Bared's sworn declaration was submitted in error. Nevertheless, the Court accepts the sworn declaration in the record as evidence for its finding of a reasonable shore power rate.

associated with the monitoring of the Waku Trinity as the Court has already awarded $468.25 per day ($458.25 per day for dockage and $10 per day for shore power) and, according to Jones Superyacht Miami's President Mr. Bared, it is reasonable to include monitoring/security services within such a rate.

### 4. Maintenance

Jones Superyacht Miami paid Captain Williams $41,080.48 and Mr. Castillo $2,500.00 for maintaining the Waku Trinity. FRS claims that Jones Superyacht is not entitled to recover these payments because it has failed to satisfy the "direction" element because "Jones [Superyacht] knew that the OFAC Amended License did not authorize Jones [Superyacht] to pay expenses on behalf of the Waku." (D.E. 109, at 15). The Court disagrees.

OFAC Amended License authorized the licensees, DLA Piper, LLP and Mr. Castillo, "to engage in all transactions necessary to: (a) pay expenses, including past due amounts, ordinarily incident to the maintenance and limited operation of [the Waku Trinity]"; (b) maintain the [Waku Trinity] listed above pursuant to applicable maritime rules and regulations, including maintaining a minimal crew and operating vessels in a limited manner for the purpose of ordinary maintenance." (Tr. Ex. 4, at 2). Here, the vessel owner's agent and OFAC licensee, Mr. Castillo, contracted with Jones Superyacht Miami to provide necessaries to the Waku Trinity, which included the maintenance of the vessel. (Tr. Ex. 1 ¶ 8). As such, the Court finds that the maintenance expenses paid for the maintenance of the Waku Trinity were provided at the direction of the vessel owner's agent, Mr. Castillo, and at a reasonable price. Accordingly, the Court shall award $41,080.48 and $2,500.00 for the monies paid to Captain Williams and Mr. Castillo, respectively.

### 5. Miscellaneous Expenses

Jones Superyacht paid for the delivery of the Waku Trinity from Fort Lauderdale ($5,092.50), a river tug assist ($550.00), hurricane preparation ($2,500.00), and shore power connection ($800.00). FRS contends that these services were not provided at the direction of Mr. Castillo. The Court disagrees and finds that these services were provided at the direction of Mr. Castillo, in accordance with the Dockage Agreement, and as authorized by the OFAC Amended License.

### 6. Administrative Fees

The Court need not reach the issue of whether an administrative fee can be recovered as part of a maritime lien because a reasonable administrative fee in this case would be no administrative fee at all, given that Mr. Bared did not request such a fee in his declaration when Jones moved to be a substitute custodian (D.E. 4-1). Accordingly, the Court shall not award an administrative fee for the invoices prepared in this matter.

### 7. Sales Tax

The Court finds that a 7% sales tax is appropriate and reasonable for the dockage and shore power costs awarded for the time that the Waku Trinity was docked at Jones' facility. Of course, these fees if required by the State of Florida are to be forwarded to the State of Florida.

## 8. Overview of Jones Superyacht's Maritime Lien

|  | # of days | Per day charge |  | Admin. Fee 2.5% | Sub Total | Sales Tax 7% | Grand Total |
|---|---|---|---|---|---|---|---|
| Dockage | 757 | $458.25 | $346,895.25 | $0 | $346,895.25 | $24,282.67 | $371,177.92 |
| Shore Power | 757 | $10 | $7,570.00 | $0 | $7,570.00 | $529.90 | $8,099.90 |
| Capt. Williams |  |  | $41,080.48 | $0 | $41,080.48 | $0 | $41,080.48 |
| Eric Castillo |  |  | $2,500.00 | $0 | $2,500.00 | $0 | $2,500.00 |
| River Tug Assist |  |  | $550.00 | $0 | $550.00 | $0 | $550.00 |
| Shore Power Connect |  |  | $800.00 | $0 | $800.00 | $0 | $800.00 |
| Delivery From Ft. Lauderdale |  |  | $5,092.50 | $0 | $5,092.50 | $0 | $5,092.50 |
| Monitoring |  |  | $0 | $0 | $0 | $0 | $0 |
| Total |  |  |  |  |  |  | $429,300.80 |

17

## IV. CREDIBILITY FINDINGS

At most bench trials, credibility findings are required to be made by the Court. This case, however, does not necessarily fit that category of trials. For example, in its closing argument FRS contends that this Court should find that Jose Bared is not credible because he testified that he attended the auction of the Waku Trinity but did not "see" his uncle, Victor Bared Sr., or his cousin, Victor A. Bared, and he did not speak with his cousin before or after the auction. FRS also points to the inconsistencies between Jose Bared's testimony and others as to the number of people at the boat auction.

Although it may be unreasonable to conclude that Jose Bared and Victor A. Bared did not discuss the Waku Trinity before or after the auction, such a finding fails to alter the Court's award in favor of Jones Superyacht. As noted elsewhere in this order, the Court finds that the dockage, shore power, maintenance, and miscellaneous expenses were necessaries provided to the Waku Trinity and done at the direction of the vessel owner's agent, Eric Castillo, at a reasonable price.

Eric Castillo was the agent of the prior vessel owner and one of the OFAC Amended License's licensees that contracted with Jones Superyacht for necessaries that were provided to the Waku Trinity.

Joseph Rossitto's testimony is relevant to the Court's inquiry of whether it has subject matter jurisdiction in this case, i.e., whether the Waku Trinity was a vessel or a "dead ship." Despite the Waku Trinity's condition during Mr. Rossitto's inspection of the Waku Trinity in September 2019, while the yacht had a dead bird on it, the yacht remained a "living" vessel for the reasons discussed in this order.

Brandon Ferguson's testimony is relevant to the subject matter jurisdiction issue. For example, Mr. Ferguson testified that in October 2019 the Waku Trinity did not have the ability to

operate on its own power because its two main engines were nonoperational. Notwithstanding the Waku Trinity's inactivity while at Jones Superyacht's facility, the Court still finds that the Waku Trinity is a vessel under the Supreme Court's *Lozman* test. *See Lozman*, 133 S.Ct. at 739. Moreover, to the extent Mr. Ferguson's testimony relates to the work completed on the Waku Trinity after it was moved from Jones Superyacht's shipyard, such evidence further demonstrates that the Waku Trinity was not "permanently incapable of marine transportation." *See Crimson Yachts*, 603 F.3d at 873 n.4

George Robert Toney's testimony is relevant to the reasonableness of certain necessaries provided to the Waku Trinity, such as dockage, shore power, and monitoring. However, the Court does not need to rely on Mr. Toney's testimony to determine the reasonableness of these necessaries, given the Plaintiff, Jose Bared's declaration. For example, as to dockage, FRS conceded that the dockage rate charged by Jones Superyacht, $458.25 per day is reasonable. As to the shore power and monitoring expenses, the Court has relied on Jose Bared's sworn declaration in determining that $10 per day charge for shore power is reasonable and a $468.25 per day charge that includes dockage, shore power, and security/monitoring is reasonable.

During the trial, the Court found Luis Oliver's testimony on monitoring to be credible. However, the Court has concluded that Jose Bared's own sworn declaration subsumes the costs for monitoring within the award for dockage and shore power and Bared's own figures under oath are indeed reasonable.

## V.     CONCLUSION

Accordingly, the Court enters final judgment in favor of Jones Superyacht and against FRS in the amount of $429,300, including prejudgment interest, for which let execution issue forthwith.

DONE AND ORDERED in Chambers at Miami, Florida, this 24th of September 2021.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record